**ARCTIC ENTERPRISES, INC., Plaintiff,**

v.

**HUBER PAINT & GLASS, INC.,**
**Defendant.**

**ARCTIC ENTERPRISES, INC., Plaintiff,**

v.

**BOULDER PARTS CORPORATION,**
**Defendant.**

Civ. A. Nos. 70–C–4, 70–C–88.

United States District Court,
E. D. Wisconsin.

Jan. 3, 1973.

Thomas W. Ehrmann, Milwaukee, Wis., for plaintiff; Kenneth D. Siegfried, Minneapolis, Minn., and Roger P. Worth, Thief River Falls, Minn., of counsel, for plaintiff.

Don S. Peterson, Milwaukee, Wis., for defendant, Boulder Parts Corporation; Timothy L. Tilton, Chicago, Ill., of counsel.

Gerrit D. Foster, Milwaukee, Wis., for defendant, Huber Paint & Glass, Inc.

REYNOLDS, District Judge.

*Preamble*

These consolidated cases having come on to trial after extensive discovery, the submission of stipulated facts, the filing of trial briefs and reply trial briefs; a separate full trial on the defenses of statutory bar having been held with opening statements and closing arguments; and the Court thereupon having determined that the controlling facts and applicable law are clear and require no further elucidation; and the Court having advised the parties in open court that the patent would be found invalid and having considered the defendants' proposed findings of fact and conclusions of law along with the plaintiff's comments thereon;

Now, therefore, this Court hereby enters its findings and conclusions which follow. (The citations are to the trial transcript.)

## FINDINGS OF FACT

1. In each of Cases 70–C–4 and 70–C–88, the Plaintiff is Arctic Enterprises, Inc., a corporation of Minnesota, and a manufacturer of self-propelled over-the-snow vehicles commonly called "snowmobiles". (R. 647)

2. The Defendant in 70–C–4 is Huber Paint & Glass, Inc.. a corporation of Wisconsin, and a dealer in snowmobiles. (R. 647)

3. The defendant in 70–C–88 is Boulder Parts Corporation, a corporation of Wisconsin, and a distributor and dealer in snowmobiles. (R. 647)

4. On December 23, 1969, United States Patent No. 3,485,312 issued to Plaintiff, on a continuation of an application originally filed May 15, 1967, in the names of Lowell T. Swenson and Roger H. Skime, as co-inventors. The patent relates to a "Snowmobile Tread Drive and Suspension System". Plaintiff is the owner of said Patent No. 3,485,312 (hereinafter referred to as the "Swenson-Skime patent"). (R. 84)

5. The Defendants were charged with infringement of the Swenson-Skime pat-

ent, and Case Nos. 70–C–4 and 70–C–88 were consolidated for trial. With the agreement of the parties, a separate trial was held with respect to the issue of validity based on alleged prior public use and/or sale, in violation of 35 U.S.C. § 102, more than one year prior to the filing date of the Swenson-Skime patent, i. e., prior to May 15, 1966 (hereinafter referred to as the critical date). (R. 84, 647)

Sales and Public Use of the

## PROTOTYPE

6. During the 1965–1966 winter and prior to the critical date, Plaintiff built an operative PROTOTYPE snowmobile (R. 85, 86) having the suspension of the Swenson-Skime patent. This PROTOTYPE, which included a new motor (R. 646) and the chassis of a prior model, was operated by Plaintiff, and subsequently sold by Plaintiff to Marvin Manning, one of Plaintiff's dealers, on or about March 1, 1966. Marvin Manning thereafter used the PROTOTYPE (R. 387) and, in April, 1966, offered for sale and sold the PROTOTYPE, without any use restriction, to a customer, one Larry G. Miller. (R. 92). After its purchase, said customer used the PROTOTYPE in a normal manner prior to the critical date. (R. 574–575). After proof by Defendants, Plaintiff stipulated that the PROTOTYPE embodied the subject matter of the Swenson-Skime patent. (R. 535).

7. The PROTOTYPE, and the suspension therein, was therefore clearly offered for sale and sold prior to the critical date, as well as in public use prior to the critical date. Further, there was no evidence that either Marvin Manning or Larry G. Miller were experimenting with or testing the PROTOTYPE. Plaintiff contended, but failed to prove, that the purchase of the PROTOTYPE by Marvin Manning was surreptitious.

Sales and Public Use of the BLACK PANTHERS

8. During the early months of 1966 and prior to the critical date, Plaintiff manufactured at least 21 BLACK PANTHER snowmobiles (Ex. 29A, 29B) which embodied the subject matter of the Swenson-Skime patent, and which had "Arctic Cat" commercial decals placed on their hoods by Plaintiff. (R. 85–87).

9. About early February 1966, Plaintiff, Arctic Enterprises, Inc., sent a letter to its distributors stating that the distributors would be receiving a BLACK PANTHER and enclosing the photographs (Ex. 29A, 29B) of a new model, i. e., the BLACK PANTHER snowmobile. (R. 374, 912).

10. Marvin Manning, one of Plaintiff's dealers, received from Plaintiff, on loan, one of the BLACK PANTHERS on or about February 20, 1966, and this BLACK PANTHER was publicly used in a race in Ada, Minnesota. (R. 168).

11. Prior to the end of March 1966, seven BLACK PANTHERS were sold to Arctic Distributors of Neenah, Wisconsin (two were without engines). (R. 168–170). Arnold "Sparky" Meyer, owner of Arctic Distributors and one of Plaintiff's witnesses, testified that, prior to the critical date, he used one of these BLACK PANTHERS in an over-the-country race with at least one other competitor snowmobile in the vicinity of Marquette, Michigan, and in the company of a dealer and several law officers who operated the BLACK PANTHER and who were prospective customers. (R. 965). In addition, Mr. Meyer testified that, prior to the critical date, he used the BLACK PANTHER in public, together with Mr. Mielke of Party Doll Fleet (R. 960) and that he permitted prospective snowmobile customers to ride the BLACK PANTHER.

12. Two of the BLACK PANTHERS sold to Arctic Distributors (the two without engines) were, prior to the critical date, resold (R. 203, Ex. 36) to

Klingeisen Welding Service of Sheboygan Falls, Wisconsin, one of Plaintiff's dealers. Sparky Meyer, one of Plaintiff's witnesses, testified that (R. 940) these two BLACK PANTHERS were subsequently equipped with engines and that, prior to the critical date, both were raced against competitive machines in a snowmobile derby at Marion, Wisconsin, in the presence of numerous spectators who were prospective customers. One of these BLACK PANTHERS won one of the racing events. (R. 966).

13. One of the BLACK PANTHERS sold to Arctic Distributors was resold (R. 203, Ex. 39) to Party Doll Fleet, one of Plaintiff's dealers, prior to the critical date. Sparky Meyer, one of Plaintiff's witnesses testified that, prior to the critical date and in his presence, this BLACK PANTHER was publicly operated by Richard Mielke, owner of Party Doll Fleet, before prospective purchasers and for the purpose of encouraging sales of Arctic Cat snowmobiles. (R. 960).

14. One of the BLACK PANTHERS sold to Arctic Distributors was, prior to the critical date, resold (R. 203, Ex. 53) to Ken's Service Station of Eagle River, Wisconsin, one of Plaintiff's dealers. the proprietor of Ken's Service Station had previously ordered the BLACK PANTHER from Arctic Distributors and, shortly after delivery, placed the BLACK PANTHER on sale and on display in view of the public at Ken's Service Station before the critical date. (R. 206, 210). No restrictions were placed on the use of this BLACK PANTHER and no instructions were given to refrain from selling the BLACK PANTHER. (R. 208).

15. Two of the BLACK PANTHERS sold to Arctic Distributors were, prior to the critical date, resold (R. 203, Ex. 38, 51) to Mattson's Dairy of Negaunee, Michigan, one of Plaintiff's dealers.

16. Prior to the end of March 1966, one BLACK PANTHER was sold by Plaintiff to Maurice Robison of Robison's Parts & Service, at Idaho Falls, Idaho, one of Plaintiff's distributors. (R. 168–170). Mr. Robison, one of Plaintiff's witnesses, testified (R. 782) that this BLACK PANTHER was previously ordered by Mr. Robison to show and demonstrate to dealers and that this BLACK PANTHER was operated in two races prior to the critical date. One race, in Park City, Utah, was organized by Mr. Robison and, in the presence of prospective customers, one of his dealers and other spectators, Mr. Robison won both a slalom and lap race against competitive machines and was awarded a trophy for winning. Subsequently, and prior to the critical date, this BLACK PANTHER and the trophy were displayed in a public portion of Mr. Robison's place of business and were seen by at least some of Mr. Robison's dealers, i. e., his customers. Mr. Robison further admitted that the purpose of the race and the purpose of displaying this BLACK PANTHER with the trophy was to generate sales. (R. 790).

17. Prior to the end of March 1966, one BLACK PANTHER was sold by Plaintiff to Mr. Robert G. Schwartz of O. G. Schwartz, Inc., at Rochester, New York, one of Plaintiff's distributors. (R. 168–170). Mr. Schwartz, one of Plaintiff's witnesses testified (R. 829, 835) that this BLACK PANTHER was, prior to the critical date, operated without restrictions imposed by Plaintiff, and in public places by Mr. Schwartz, and many other members of the public, including dealers, and was also operated in competition with other machines to demonstrate to one of Mr. Schwartz's dealers and to other experienced snowmobilers the hill climbing capability of the BLACK PANTHER. Mr. Schwartz further testified (R. 846) that the purpose of the demonstration was to help sell snowmobiles.

18. Prior to the end of March 1966, seven BLACK PANTHERS were sold by Plaintiff to Universal Distributors of Anchorage, Alaska, one of Plaintiff's distributors. (R. 168–170). Prior to the critical date, two of these seven BLACK PANTHERS were sold to Casey Humphrey of Kotzebue, Alaska, one of Plaintiff's dealers. (R. 281, 351).

19. Another two of the seven BLACK PANTHERS sold to Universal Distributors remained uncrated until after the critical date. (R. 282). The other three BLACK PANTHERS were shown to the public by Universal Distributors (R. 337) and were used by the public as demonstrators and in racing. (R. 336).

20. Prior to the critical date, Burton K. Johnson, owner of Universal Distributors, offered to sell Universal's entire snowmobile business, including at least five of the BLACK PANTHERS bought by Universal from Plaintiff, to Joseph M. Reilly. (R. 278–280).

21. Prior to the critical date, one BLACK PANTHER was sold by Plaintiff to Valentine Distributing, of Aurora, Colorado, one of Plaintiff's distributors. (R. 168–170). James C. Valentine, one of the operators of this distributorship, as a witness for Plaintiff, admitted that this BLACK PANTHER was seen by the public, including dealers and other customers, prior to the critical date, on the premises of the Valentine Distributing business. (R. 875).

22. Prior to the critical date, other BLACK PANTHERS were sold (R. 168–170) to Traverse Bay Marine, at Traverse City, Michigan, another one of Plaintiff's distributors, to Hank Asper of Lock Haven, Pennsylvania, another of Plaintiff's distributors, and to Hallock Mileage, at Hallock, Minnesota, one of Plaintiff's dealers. (R. 168).

23. Therefore, the BLACK PANTHERS, including the suspension of the Swenson-Skime patent, were placed on sale, repeatedly sold, and repeatedly publicly used prior to the critical date.

### Plaintiff's Commercial Purposes

24. Plaintiff's distributors and its dealer, who received the BLACK PANTHERS from Plaintiff, were Plaintiff's customers, and were independent of Plaintiff. (R. 168). Further, the above enumerated sales of BLACK PANTHERS by Plaintiff to its seven distributors and to its dealer, Hallock Mileage, were on regular invoices and on regular commercial terms. (R. 171).

25. The distributors to which the BLACK PANTHERS were sold were instructed by Mr. Rugland, Plaintiff's Vice President, to show them to dealers and to gain public acceptance. (R. 243, 244, 247, 273). Plaintiff's distributors and dealers who purchased BLACK PANTHERS prior to the critical date were not instructed or requested to maintain the BLACK PANTHERS secret or confidential. Such BLACK PANTHERS were operated in public places by said distributors and dealers and were seen by other dealers and members of the public prior to the critical date. (R. 174–175).

26. Prior to the critical date, one BLACK PANTHER was delivered to Everett Chapman, a sales representative for Plaintiff. (R. 170). Subsequently, and prior to the critical date, this BLACK PANTHER was delivered to Robert Rodney Hughes of Randolph, Vermont, who, at that time, was one of Plaintiff's dealers. (R. 892). Mr. Hughes, one of Plaintiff's witnesses, testified (R. 893) that, prior to the critical date, he openly displayed this BLACK PANTHER to the public and invited the public to use this BLACK PANTHER. Various members of the public did so prior to the critical date. When snow was no longer available and prior to the critical date, this BLACK PANTHER was displayed to customers in a public portion of Mr. Hughes' business enterprise. (R. 905).

27. Snowmobile racing, including BLACK PANTHER racing, has been engaged in, at least in part, for the purpose of promoting or generating snowmobile sales. This fact is supported by the testimony of Mr. Rugland, Plaintiff's Vice President (R. 763), Mr. Robison (R. 790), Mr. Schwartz (R. 846), Mr. Meyer (R. 969), and Mr. Asper (R. 923), all witnesses called by Plaintiff, and by the adverse testimony of Mr. Hetteen (R. 156) one of Plaintiff's officers.

28. Plaintiff has alleged that its sales of BLACK PANTHERS were part and parcel of a legally permissible experimental program. The evidence presented at the trial establishes that, to the contrary, the BLACK PANTHERS sales were part and parcel of a commercial undertaking aimed at promoting and generating sales for the subsequently produced "PANTHER" snowmobiles.

29. The evidence presented at the trial also establishes that Plaintiff's activities, in connection with the BLACK PANTHERS, were not limited to an experimental program directed solely to the legitimate perfection of the subject matter of the Swenson-Skime patent. Contrariwise, the evidence establishes that whatever testing may have taken place was directed toward the BLACK PANTHER snowmobile as a whole and that the BLACK PANTHER snowmobile embodied many new features in addition to the subject matter of the Swenson-Skime patent. Further, the evidence presented at the trial fails to establish that Plaintiff exercised any control over the use and operation of the BLACK PANTHERS while in the hands of Plaintiff's distributors and dealers.

### Other Related Circumstances

30. Even though Mr. Swenson, Plaintiff's President, was aware of the sales of the BLACK PANTHER machines prior to the critical date, he signed the usual oath (Ex. 343) which accompanied the filing of the patent application resulting in the Swenson-Skime patent, and which stated that the Swenson-Skime subject matter had not been in public use or on sale for more than one year. Although no mention is made in the oath of such BLACK PANTHER sales (R. 378) even though Mr. Swenson had knowledge of such sales (R. 397–398), I cannot find that his understanding of the significance of signing such an oath was such as to amount to willful fraud.

31. On June 5, 1967, Plaintiff filed a trademark application (Ex. 321) on the name "PANTHER" claiming a date of first use in interstate commerce of February 15, 1966, which date is stipulated as representing the first shipment of a BLACK PANTHER to Universal Distributors. (R. 376, 394–395). On March 3, 1970, after filing of the Huber suit 70–C–4, Plaintiff amended the "PANTHER" trademark application (Ex. 321) to change the date of first use from February 15, 1966 (before the critical date) to September 2, 1966 (after the critical date). (R. 375).

32. On March 30, 1970, Plaintiff answered Interrogatory 7 in 70–C–4 stating the date of first public use appears to be June 4, 1966, and the date of first sale appears to be September 1966. (R. 398). On August 25, 1970, the depositions of Marvin Manning and Larry G. Miller were taken, which depositions constitute the first disclosure of public record that the PROTOTYPE was sold and resold and publicly used before the critical date and that at least one BLACK PANTHER was used publicly before the critical date. (R. 980). On March 24, 1971, Plaintiff admitted in answer to Interrogatory 119 (R. 399, Ex. 344) that the answers to Interrogatory 7 in 70–C–4 were "incorrect" even though, at the time of answering Interrogatory 7, Plaintiff and its attorneys admittedly had knowledge of sales of the BLACK PANTHERS. (R. 979, Ex. 346).

33. The foregoing circumstances with regard to the patent application oath, the trademark application, and the interrogatory answers do not establish any deliberate or willful fraud by Plaintiff.

### CONCLUSIONS OF LAW

1. United States Patent No. 3,485,312 is invalid because the subject matter thereof was in public use in this country more than one year prior to the date of the application for patent in the United States.

2. United States Patent No. 3,485,312 is invalid because the subject matter thereof was on sale in this country more than one year prior to the date

of the application for patent in the United States.

3. United States Patent No. 3,485,312 is invalid because the subject matter thereof was sold in this country more than one year prior to the date of the application for patent in the United States.

4. Defendants' motion for attorneys' fees is denied.

5. Costs are awarded to Defendants.

For the foregoing reasons, the attorneys for the defendants are directed to present an order for judgment in accordance with these findings of facts and conclusions of law after first submitting it to opposing counsel for approval as to form.